## Case No. 7,266.

### JENKINS v. ELDREDGE et al.

[3 Story, 181.] [1]

Circuit Court, D. Massachusetts. May Term, 1844.

[1] [Reported by William W. Story, Esq.]

B. R. Curtis and S. Greenleaf, for plaintiff.
William H. Gardiner, for defendants.

STORY, Circuit Justice. This cause is one of extraordinary complexity, and no small difficulty, as well in the principles of law involved in it, as in the conflicting and varied details of the evidence. It has been most fully and elaborately argued at the bar; and to discuss it, at large, upon all the topics, embraced in the argument, would require from the court a length and volume of opinion and reasoning, totally inconsistent with its duties to other suitors. What, therefore, I shall endeavor to do, is to bring into view those principles of law, which must form the foundation of the ultimate decree of the court, with such allusions only to the evidence, as may serve to show, what are the conclusions of fact, to which I have arrived, as, on the whole, the best supported, without any effort to reconcile discrepancies, or to explain or dissipate the obscurities, which surround many parts of it. And, after all, I am persuaded, that so far as my own judgment is concerned, it is to the survey of the cause in masses, and not in minute details, that I may hope to expound the grounds of my own opinion, and to enable the parties to take the opinion of the supreme court, upon an appeal in the premises. The bill of the plaintiff and the answer of Eldredge present, in truth, the entire outline of the case, as each party desires to have it to be understood, and supersedes the necessity of any other detailed statement.

The great points in the cause, to which all others are subordinate, and on which all others depend, are, (1) whether Eldredge originally took the property in controversy upon trust for the ultimate benefit of Jenkins, substantially as stated in the bill; and if so, (2) whether that trust is one, which, in point of law, it is competent for this court to direct to be carried into execution.

That there was a trust of some sort between the parties seems to me clear from the whole evidence in the case, including the answer of Eldredge. The latter insists, indeed, that it was a mere honorary understanding, or arrangement, dependent, for its execution,

solely upon his own free will, discretion, and pleasure, and by no means constituting, or intended to constitute, any trust binding in law or in equity, and that Jenkins always so understood it, and agreed to it. At the same time, Eldredge admits, that his motive in engaging in the speculation or enterprise was, mainly, with a view to the benefit of Jenkins's family, with some of whom he was nearly connected, after receiving a full remuneration for his own services and advances, if the speculation should turn out to be successful. In furtherance of this view, he states in his answer, "And this defendant denies, that any agreement or understanding whatsoever, except the express agreement and understanding between the said complainant and this defendant, that this defendant should take a title to said property, free from all right or claim on the part of the said complainant, express or implied, in law or equity, (as in the complainant's seventh interrogatory is inquired for,) ever existed, or was made between the said complainant and this defendant, other than the expressions of the motives and designs of this defendant, depending wholly on his own free will, and discretion, and pleasure, for the execution thereof, as therewith expressly declared and fully understood, as hereinafter fully and particularly declared and set forth, and every allegation of any other or different agreement, or understanding, express or implied, in the said complainant's said bill contained, this defendant denies. And this defendant says, that although there was no such agreement, as by said complainant alleged, and although he, this defendant, always refused to take. or hold, any conveyance or title, excepting an absolute and unconditional estate in the premises free from any trust whatsoever; nevertheless, he freely admits, that one one of his motives in purchasing the said estate, from the said Deblois, and taking the conveyance thereof from her, herein stated, was, besides the hope of profit and benefit to himself. a desire also to benefit the complainant's family, and with them. the complainant himself, and that this defendant then believed, that if the said building should be completed, in the manner projected, it might yield some pecuniary profit, and that it was his design, and intention, if, in the end, the same should be found to exceed in value the amount of all his payments, expenses and liabilities therefor, and such reasonable profit to himself, as he should in his own discretion think right, and also the amount of certain debts then, and before, and now due, to this defendant, from the said complainant, and also from a member of his family, then to give to the said complainant, or to his family, an opportunity to purchase the same for the amount of all his, this defendant's payments, expenses and liabilities therefor, and other claims aforesaid. And this defendant freely also admits, that he did, after the expiration of the time fixed by said decree, and not before. state his motive and design aforesaid in conversation with the said complainant, both before, and after his, this defendant's, receiving the conveyance from the said Elizabeth herein stated, but this defendant expressly declares, that while thus having and expressing such motive and design, it was therewith also distinctly declared by this defendant to the complainant, and. by the said complainant at all times well known and understood, that no agreement whatever in any way binding upon this defendant, either at law or in equity, existed or was made or should be made, or was intended to be made by this defendant, or between him and the said complainant; nor was this defendant to be in any way, or by any means, a trustee for the complainant in respect of the premises, but that, on the contrary, the said land and estate was, and was to be, the property of this defendant, absolutely, and unconditionally, with the right of disposal thereof, and of the proceeds thereof, at his own discretion and free will and pleasure, in such way as he should think fit; all which this defendant says was often and expressly declared to the said complainant, and as often and expressly admitted and assented to by said complainant, and that said declarations and admissions, were so full, clear, and explicit, that no possibility of mistake or misapprehension, could or in fact did exist, or remain on the part of the said complainant."

On the other hand, Jenkins insists, that, although it was agreed between himself and Eldredge, that there should be no written agreement given or held by Jenkins, which should evidence the nature of the trust between him and Eldredge, yet that it was positively agreed, that Eldredge should hold the property in trust for him, subject to the agreement between them, the due execution of which required, that Eldredge, in order to raise money to complete the erections on the land, should possess a clear title, which he should be able to convey to the purchaser free from all incumbrances and equities. And that it was a contemporaneous arrangement, that Eldredge should make and keep among his own papers a written declaration of the trust to evidence the same in the event of his decease, or other like necessity. The bill charges, "That as said Eldredge had not the capital for that purpose, and would need the legal title to said property, both to enable him to borrow money to secure him for his liabilities as the indorser or surety of your orator and for the compensation to be paid to him for all his trouble in the business, your orator formally, distinctly. and solemnly. agreed with said Eldredge that he, said Eldredge, should receive a conveyance of said land, with the buildings thereon, from said Elizabeth, and should raise money thereon by mortgage, in order to furnish your orator with the means

to proceed in the erection and completion of said edifice, and on completion thereof should execute and deliver to your orator a deed of conveyance thereof, your orator agreeing to reimburse to said Eldredge, or save him, said Eldredge, his heirs, executors and administrators harmless, and indemnified from and against all payments, which he or they might be compelled to make, by reason of any such mortgage, and to pay to him or them a suitable compensation for his services in the premises. such indemnity, reimbursement and payment to be secured to said Eldredge by a lien upon said premises. And the said Eldredge further agreed, that he would make a declaration in writing, specifying the terms, trusts and conditions on which the said property should be held by him, and place the same among his papers, to serve for the disclosure and manifestation of said trusts, terms, and conditions, in the event of his decease, or other like necessity; and in pursuance of said agreement with said Eldredge, your orator procured to be furnished to him by a personal friend and relation of your orator certain securities, upon and by means of which the said Eldredge borrowed the sum of about six thousand dollars, to be paid by him to said Elizabeth, in part satisfaction of the consideration money of said purchase, pursuant to the decree aforesaid, and which sum the said Eldredge afterwards repaid, and relieved the securities aforesaid, and returned the same to James W. Jenkins Jr., the person who furnished him therewith, out of moneys received by him upon a mortgage or mortgages of said land; and your orator, by mutual agreement with said Eldredge and said Elizabeth, and for the sole purpose of making his title under her appear to be simple and unqualified, and not with any idea of parting with or surrendering his beneficial interests in said land or purchase, but the more effectually to secure them, permitted the time specified for fulfilment of said decree to pass by, without compliance with its terms, and said Elizabeth, at the special instance and request of your orator, executed and delivered to said Eldredge a deed of said land dated August the 24th, A. D. 1840, a copy whereof is herewith exhibited."

The first inquiry, therefore, is whether, taking all the circumstances together, the trust was a mere honorary trust, such as has been stated, possessing no legal or equitable obligation, and resting purely in the good will of Eldredge, to be fulfilled or not by him, according to his mere pleasure, or it was, in fact, a trust to be operative and binding between the parties, and creating, as between them, whatever might be its operation as to third persons, a clear equitable right to have the property transferred from Eldredge to Jenkins, after discharging all the incumbrances and charges. properly attached thereto. This is a question of no inconsiderable difficulty upon the actual posture of the evidence. In order to a just solution of it, it is necessary to look carefully to the situation of the parties, when the negotiation with Eldredge took place, to the objects manifestly in view, to the surrounding circumstances, and to the subsequent transactions of both parties.

What then was the state of things before and subsequent to this period? Jenkins was an experienced builder, perhaps somewhat too much inclined to become a speculating projector. In April, 1839, he purchased at public auction a certain parcel of land at the corner of Tremont and Bromfield streets, in Boston, for $20,169.50, then owned by Miss Deblois, and constituting the premises in controversy. Being unable to comply with the conditions of sale, a new arrangement was made in May following between Jenkins and Miss Deblois, that her warranty deed, conveying the premises to Jenkins, should, upon the execution of that agreement and the payment of $1000 by Jenkins to her, be deposited in the hands of Thomas W. Phillips, Esq. in escrow, and retained by Phillips until the 24th of July following; and if Jenkins, on or before that time, should pay to Deblois the sum of $5042.50, with interest, &c., and should execute a note to Deblois, for $15,127, payable in five years, with interest, &c., and also execute a mortgage of the premises to Deblois, as security for the payment of the note, and also of the taxes assessed on the premises, Phillips was to deliver the deed to Jenkins; otherwise, the contract for the sale of the land was to be terminated and annulled, without prejudice to Deblois's right to claim damages for the non-performance of the contract; and the $1000 was to be forfeited to Deblois. Jenkins paid the $1000, pursuant to the agreement. Jenkins immediately afterwards went into possession of the land, and proceeded to excavate the same, and to begin the erection of a building thereon, and expended a large sum of money thereon, which, in his bill, he alleges to have been about $15,000. His resources being then exhausted, he was unable to comply with his agreement by paying the $5042.50 in July, 1839, as stipulated; and Deblois, pressing payment, threatened to sell the premises at auction. In order to prevent this, Jenkins filed a bill in equity in the supreme court of the state of Massachusetts in May, 1840, to restrain the sale, and for relief, and an injunction was accordingly granted. The answer of Deblois having been put in, it was then agreed by the parties, and accordingly an interlocutory decree was passed on the 22d of June, 1840, that if Jenkins should, on or before the 20th of July, 1840, pay or tender to Deblois the amount due her under the contract of May, 1839, and perform all the other parts of the contract. then the injunction should stand continued to the hearing of the cause, unless Deblois should ac-

cept the same with costs, and perform the said contract on her part; in which event, the bill was to be dismissed; and also to be dismissed, if Jenkins failed to tender and perform, as aforesaid. Jenkins did fail to perform his part of the agreement, and thereupon the bill was dismissed accordingly, on or about the 20th of July, 1840. In the intermediate time between the passing of the decree and the failure to perform it, Jenkins made an application to Eldredge for his aid and assistance to raise money, and otherwise to complete his enterprise. It was thereupon arranged between Jenkins and Eldredge, that the premises should be conveyed by Deblois to Eldredge; and accordingly the same were conveyed to him by her deed dated 24th of August 1840; and Jenkins afterwards, on the same day, in order to make the second title complete in Eldredge, and freeing "it from the exception contained in Deblois's deed, excepting any clause or demand, made by, through, or on account of Joseph Jenkins, and also excepting any claim or demand arising out of any contract, made by, or with said Jenkins," executed a release to Eldredge, by which he admitted in terms, that he had "no legal or equitable right in or to the same." From that time forward, Eldredge continued to be ostensibly, and so far as the second title was concerned, the sole and exclusive owner of the legal and equitable estate in the premises. Jenkins was subsequently employed superintending the erection of the building. The necessary moneys were advanced or provided by Eldredge, generally upon his own credit, but sometimes, as it should seem, through the aid of the credit of some of Jenkins's relatives. And according to the testimony of Jenkins, Jr. his father not only superintended the building after Eldredge had the title, but actually, when Eldredge ceased to advance funds, provided work and materials for the same, on his own account, to the amount of $3244.16.

Now, pausing at the time when Eldredge agreed to enter into the arrangement with Jenkins, which was in successful progress, if not absolutely and definitively completed before the expiration of the time assigned by the decree for the payment of the money, or the dismissal of the bill, what possible motive could there be for Jenkins to enter into it, unless he was to receive ultimately some fixed and certain benefit from it? He had already embarked a considerable sum of money in the enterprise; he had bestowed his skill, time, and labor upon it; he had not only paid money, but he had entered into collateral contracts respecting it, which were obligatory upon him. If then he was about to part, as between himself and Eldredge (for the question might be very different in respect to the rights of third persons), with all his interest in the premises, how should it happen, that not the slightest remuneration or indemnity was pro-

vided for him in the negotiation with Eldredge? Was he to sink all that he had expended of time and money, for the benefit of Eldredge, with nothing left but a barren spes recuperandi, resting upon the mere pleasure, and good will, and generosity of Eldredge? Such a supposition, with reference to an embarrassed man, is somewhat startling, especially when we look at the magnitude of the interest at stake. If there had been any pretence, that Eldredge entered into an agreement only to remunerate Jenkins out of any surplus, in the event of a successful termination of the enterprise, after all other incumbrances and charges were paid for, there might be some ground to say, that Jenkins, from his sanguine temperament, was content to rely solely on that, as a sort of tabula in naufragio. But Eldredge flatly denies any such agreement, and treats the transaction as a surrender of the whole premises to himself, unclogged with the slightest charge for the benefit of Jenkins. And then again, how did it happen that Jenkins was not only to superintend, but that he did actually superintend the erection of the building after the conveyance to Eldredge, without any agreement or understanding (for none is pretended) for any remuneration or compensation for his future labor and services? It is true that the plaintiff did afterwards make a charge for his services, after disputes had arisen between him and Eldredge; but that claim was never allowed. The manuscript account since produced by order of the court contains no allowance of any such compensation. It is impossible not to feel, that there is, under such circumstances, an intrinsic improbability, which casts a shadow over this part of the case. But, then, it is said, that in reality, at the time of the negotiation with Eldredge, the case, as to Jenkins, was hopeless, and that being without credit, he had, and could have, no reasonable ground to believe, that he could find any means of relief beneficial to himself; and that at the time when the deed was with his consent given by Deblois to Eldredge, the decree in the equity suit had become absolute, and all rights of every nature of Jenkins in the premises had become extinguished.

In the first place, it is by no means clear, that, at the time of giving the deed, the rights of Jenkins were extinguished, as the argument supposes. The decree in the equity suit was a mere dismissal of the suit, by the agreement of the parties, and not a decree of dismissal after a hearing upon the merits. A decree is a good bar to a future suit only when the dismissal is upon the merits. It may, under other circumstances, and especially under circumstances like those of the case before the court, constitute a material ground, why the court may not, in its discretion, at the hearing, grant any relief upon a second bill; but it is not pleadable as a flat bar to such a second bill.

Besides; why might not a court of equity, upon such second bill, have directed a sale of the estate, allowing Deblois to become a bidder, and, if the estate should sell for more than the purchase money, to decree the surplus to Jenkins?—Certainly there is no insuperable barrier in the doctrines and practice of a court of equity to prevent such a decree. But assuming it were otherwise, still it would by no means follow, that because Jenkins had no legal or equitable right to the premises, Deblois would have conveyed the premises to Eldredge, except at the solicitation of Jenkins, and with a view to benefit the latter; and even this, if in the nature of a good will, was a surrender on the part of Jenkins, of claims valuable to him, although resting in the mere discretion of Deblois.

In the next place, it is manifest that Jenkins was lulled into security by the negotiation with Eldredge, and was thereby induced to make no other efforts to obtain relief, before the time prescribed by the decree had expired, and that he placed implicit reliance, and unlimited confidence, not only in the ability of Eldredge to relieve him, but also in his strong friendship and earnest desire to aid him, and this may well account for the fact, that he suffered the decretal time to expire, without seeking assistance elsewhere, in the firm persuasion, that Deblois would interpose no objection, if he was successful in obtaining aid from any quarter. In this respect, it is plain, that he was not misled, and Deblois waived her strict rights in favor of Eldredge, at the solicitation of Jenkins. It is equally clear, from all the evidence, and from Eldredge's own acknowledgment in his letter of the 5th of August, 1840, that Eldredge was fully persuaded, that the speculation would be a safe and profitable one; and that he should receive an ample remuneration from it for his advances and services, or, to use his own expressive language to Mr. Phillips, that he should "take a good shave out of it." Then, again, it is said, that the deed of release of Jenkins to Eldredge, of the 24th of August, 1840, already alluded to, demonstrates that Jenkins then claimed no legal or equitable title in the premises, and professed to surrender all claim thereto, so that, from the moment of the execution of that instrument, if not before, Eldredge ceased to be a trustee of Jenkins for any purpose whatsoever. But it appears to me, that the conclusion drawn from this transaction does not reach to the extent suggested. It proves no more than what was the original and admitted intent of the parties, to put into Eldredge's hands the whole legal and equitable title to the premises, so far as respected third persons, so that he might be able to raise money thereon to complete the building, and discharge the incumbrances. It was not only not inconsistent, but in entire harmony, with the case set up by the bill. The legal and equitable title was to be in Eldredge, not only for the purposes above stated, but also to guard the property against any attachments and levies by the creditors of Jenkins. Nay, we find some of the creditors soliciting the conveyance to be made to Eldredge by Deblois, for the very reason that they considered it to be for their interest. The ultimate trust in the premises, therefore, (if any was intended), was designedly to be a trust resting mainly in personal confidence, and dependent upon the good faith of Eldredge, and not to be evidenced by any written acknowledgment, which was accessible to Jenkins. Whether, under such circumstances, it is a trust available in equity, is another question, which will hereafter be considered.

There is one other circumstance, upon which some stress has been laid, which may be noticed in this connexion, to which I confess that, under all the circumstances, I attach very little weight. It is the conversation testified to by Moses Kimball, as having taken place between Jenkins and Eldredge on the 6th of January, 1841.—Kimball's memorandum is in these words: "This day, between 11 and 12 o'clock, a. m., I was present at a conversation between Mr. Eldredge and Colonel Jenkins. Mr. Eldredge requested me to pay attention to what he said. He said, that in a letter received from Col. Jenkins that morning, he, Jenkins, stated that he, Eldredge, stood, in his relation to the estate, in the light of mortgagee, and that he then asked of him (the colonel) whether he retracted what he had said in the letter—after some hesitation, the colonel referred to the letter as stating the matter explicitly, but on being crowded by Mr. E. for a definite answer, he declined to answer either way. Mr. E. then said, that he must cease to be the superintendent of the building. Some other conversation having ensued, Mr. E. asked Jenkins if he wished to deny that the estate belonged to him. Col. J. said no. I consider that your title to it is as good as to the hat on your head. After some further conversation, Mr. Eldredge asked if he was to understand him, Jenkins, to say that he, E., stood in relation to the estate as a mortgagee—Jenkins said no, it would be foolish for me to say so.—Mr. E. then said, that he revoked what he said about superintendency." What is this but the reluctant confession of Jenkins, forced by a stern necessity against his own sense of the truth and justice of the case, as stated in his letter of the same morning, and, as far as the evidence goes, in conformity to what he constantly, if not invariably, maintained as the substance of his arrangement with Eldredge? As a confession, it is worth nothing; as a waiver of rights, previously existing, it is equally insignificant.

Without dwelling further upon these general considerations, I must say, that upon the fullest survey of the general evidence in its details, as well as in its general struc-

ture, it does appear to me, that it is utterly irreconcilable with any other supposition than the existence of the confidential relation of principal and agent between Jenkins and Eldredge throughout this whole transaction, from its inception to its close. I do not say, that all the statements and circumstances are perfectly reconcilable with each other. There are conflicting and contradictory statements, and opposing testimony. Still it does appear to me, that, taking the mass of the oral evidence, supported as it is to a considerable extent by written evidence, the court can safely arrive at no other conclusion than that, which I have indicated. I am fully aware of the strong denials contained in Eldredge's answer, and of the just weight, which is to be allowed to such an answer. Still it must be weighed against other opposing evidence and circumstances; and I may add, that much which is contained in this answer, inevitably leads to the conclusion, that Eldredge had always present in his mind, that he was not acting alone for his own exclusive interest, but that the interest of Jenkins was also to be consulted and sustained, and was involved in his acts. On the other hand, it is beyond doubt, that Jenkins always considered, that his interest was mainly to be consulted and sustained throughout, and, after all other charges were paid, that the residue of the proceeds of the speculation was to be his. Eldredge could not but know this; and if he concealed from Jenkins, that he had no such intention, but meant to act solely and exclusively for his own interest, such a concealment would, in the contemplation of a court of equity, constitute a meditated fraud upon Jenkins. The letter alluded to in this conversation, although in Eldredge's possession, has not been produced by him. It might throw great light upon the subject.

I will now proceed to suggest some of the reasons, which lead me to maintain, that there was an intentional secret parol trust, behind and beyond, but in concordance with the written documents conveying the title, upon which Jenkins and Eldredge originally acted as the basis of their arrangements, and which was never waived or extinguished.

In the first place, let us see how Eldredge states the matter in another part of his answer, not heretofore referred to. He says, "That he never did agree with the said complainant, that he, this defendant, would make any written declaration or memorandum of any trust or condition, as in the said bill of complaint set forth, or any other declaration, or memorandum, of any trust, or condition, or agreement, whatsoever, touching the premises. And this defendant says, that it was always before, and at the time of, and since the receiving of the said conveyances from the said Deblois by this defendant, expressly declared to the said complainant, and assented to by the said complainant, that nothing whatsoever should be written, even upon the subject of this defendant's intentions and designs aforesaid, and that the reason thereof was also repeatedly stated to the said complainant, that is to say, that this defendant might not, by any such statement, incur any risk of affecting his own absolute title to the said estate and property, even by such a statement of his intentions, which might be misconstrued, inasmuch as he intended to retain the absolute title and disposal thereof, and to insure to himself the power and discretion of doing therewith as he might think right and best, or words to that effect, it being well understood and agreed between the said complainant and this defendant at all times, that nothing was to be done, or agreed, whereby any express, implied or resulting trust in law or equity should or could be created or arise for the benefit of the said complainant, and this defendant denies the making of any expressions to any person whatsoever of any intention or purpose to make any writing whatsoever upon the subject, excepting only, that at some time after the receiving the conveyance from the said Deblois herein mentioned, and when and after the whole title and estate in the said lands were absolutely and unconditionally in the said defendant Joseph Jenkins, Junior, a son of the said complainant, once said to this defendant, that he ought to make some writing, declaring his intentions in regard to said estate, as he might die before the matter was ended, and in that case, his heirs could not know and carry out his intentions, or something to that effect, to which this defendant answered, that he should not do so, and added that it had been expressly declared by him to the said complainant from the beginning, and fully understood, that there was to be no writing whatever, and for the express reason, that this defendant would have his title absolute and unincumbered with any trust or condition whatsoever in law or equity; to which the said son of the said complainant replied, that his request was not, that any paper should be delivered to any one, but simply that this defendant would place such a writing among his own private papers, that in case of his death, his heirs might be able to do with the estate, what he, at his own free will and pleasure, would do, if living, for the benefit of the said complainant and his family, or something to that effect; to which this defendant, the same then seeming to him expedient, replied, that he would make some deed of trust to be placed among his papers to provide for such contingency. And this defendant says, that he intended at that time, and believes he was, from the conversation that was had, clearly understood to intend, by the expression deed of trust, only a paper in writing expressive of his designs and intentions as herein set forth and no other or different

writing. But after said conversation, this defendant, reconsidering the whole matter, thought it inexpedient to make any writing whatsoever, and did not make any such writing, having from the beginning declared his intention to do nothing, which could even by bare possibility be construed as admitting or creating any title to, or interest in, or claim in any way to or upon the said lands and building in the complainant."

Now I would remark, that this statement is in its character somewhat extraordinary. It denies, indeed, that he, Eldredge, ever intended, by any written memorandum, to fetter his complete legal and equitable title in the premises, with any trust; and yet it does admit, that he did tell Jenkins, Jr., that he would make a deed of trust, and place it among his own papers, to provide for the contingency of his death. Why should he do this, if he was not conscious, that, in fact, all the parties in interest understood, that such a trust was intended to be operative; but at the same time it was to be such as would not interfere with the unconditional power to dispose of the premises to third persons? Eldredge admits, that he never did execute any such deed; but he does not pretend, that he ever communicated this change of intention either to the father or the son. Why this concealment? But this statement is directly contradicted, in its most important features, by Jenkins, Jr., in his testimony. Speaking of the negotiation between Jenkins (the father), and Eldredge, he says: "There were a number of interviews at my office for this purpose, and finally my father, in presence of J. W. Jenkins, Junior, and myself, proposed to Eldredge that he should take the title of the estate and mortgage it for the necessary amount, and upon the completion of the building convey it to my father. Eldredge had often said that he could raise the money if he could have the title in his own hands. Eldredge accepted the proposal and agreed to raise the funds necessary to the completion of the building and the payment of Miss Deblois on short time, if not otherwise obtained—then obtain a permanent loan covering all the liabilities of the estate, and deed the estate to my father subject to the incumbrances. My father agreed for this service to secure a handsome compensation to Eldredge by a subsequent mortgage of the estate, and to include in that compensation a mortgage which Eldredge had for about $2000 on a farm in Barre. This Eldredge agreed to distinctly." Again he says: "It was agreed that Eldredge should have as perfect a paper-title as could be made, so that he could raise money on the estate expeditiously, and also that he might not be subjected to any trustee process." And again: "It was agreed that no bond should be given by Eldredge, but that he should make a memorandum or declaration of trust, which he was to keep among his own papers. This agreement was made before Eldredge took the title." But, what bears more precisely on the point under consideration, again he says: "After the deed had been made to Eldredge, I was told by some of my friends that Eldredge talked to them in a manner different from his manner of talking to me with regard to this matter, and they thought my father should be put on his guard. In consequence of these remarks I asked Eldredge the next time that he came into my office if he had written the declaration of trust which had been agreed upon, and which was to be kept by him among his own papers. He replied, that he had not, and that my father had required no bond from him, but had trusted entirely to his life and his honor, and that he would carry out the agreement at all hazards. I said, that it was perfectly apparent, that my father had trusted to his honor, but that it was understood and agreed at the time of the negotiation, that a declaration of trust was to be made, which he might keep among his own papers, so that in the event of his death the very object of the whole negotiation might not be frustrated; he then said he had no objection to making such a declaration, and would do so immediately." Now, the importance of this testimony cannot be overlooked. But it is said, that it is not credible testimony, and various and minute objections, assailing its credibility, have been relied on at the argument. Certainly, standing alone, however credible, it would not be sufficient to impeach or outweigh the answer.

But it does not stand alone. It is confirmed in its leading points, the existence of the trust, by the testimony of Mr. Hilliard, who was the counsel of Jenkins. He says: "I have knowledge of such an agreement; my knowledge was obtained from declarations of Eldredge, and conversations, which I have had with him, and conversations, which I have heard between him, and Jenkins; at the time when this agreement was entered into, Eldredge was in my office every day, and this subject was frequently and freely discussed, and talked over between us; the agreement, as I understand it, was this, that Eldredge should take a conveyance of the estate from Miss Deblois, and that, by a mortgage of the property, together with his own personal security, he should raise a sufficient sum of money to complete the building, and that, after the completion of the building, he should convey the estate to Jenkins, subject to such mortgages as he might have put upon it for the purpose of raising the money, and that he should receive a mortgage subsequent to those last mentioned to secure his own compensation for his services; and that a mortgage of a certain farm in Barre, belonging to Col. Jenkins, which he held at that time for prior indebtedness, should be given up, and that

amount should be secured in addition to this compensation for services by this subsequent mortgage. I hired an office in Brazer's building about the middle of May, 1840, and I was sick and confined to my house about a fortnight after that, so that I was not at my office until about the first of June, and it was soon after that period that these plans were first disclosed to me by Eldredge and Jenkins. I can say confidently, that it was certainly within a month after, that I knew of the arrangement between Eldredge and Jenkins. Eldredge once inquired of me what in my opinion would be the effect of allowing a certain decree of the supreme court in relation to this property to expire; whether in that event, if he should afterwards take a deed from Miss Deblois, it would give him such an absolute, indefeasible title that he would be subjected to no trouble and embarrassment from the creditors of Col. Jenkins; whether I expressed any opinion on that subject or not, I don't remember. I have had many conversations with Mr. Eldredge during that period; he has often stated to me that he held the estate in trust for the benefit of Colonel Jenkins; he has often spoken of it in terms as Col. Jenkins's property; he stated to me that he was acting merely as an agent, and that he meant to be well paid for his services. I recollect his asking me at one time how much I thought he ought to receive for his services; he said he thought the estate would be a fortune to Col. Jenkins; he never said any thing to the effect that he was under no obligations to convey the estate to Col. Jenkins, or that it was all to depend on his free will and pleasure, and nothing to that import." James W. Jenkins, also, who stood in a peculiarly confidential relation to the parties, is equally explicit. He says in his testimony: "During these interviews with Eldredge, he said, that he could get a deed of the estate, if I would furnish him with the means. At one time it was proposed and agreed to, that I should furnish Eldredge with negotiable paper, upon which he might raise $5000, or enough to pay the instalment to Miss Deblois. It was also agreed, that Mr. Eldredge should take a deed of the estate from Miss Deblois, and hold it for the purpose of raising more money to enable Colonel Jenkins to complete the buildings. The paper, which I furnished, was returned to me, as not being known in this market. Mr. Eldredge, at the time that this paper was returned, stated to me, that if I could furnish the colonel with other paper, not too long, and good, that it could be done, no doubt, and advised me to do so, and assured me, that I should be perfectly safe in so doing. Accordingly, the next time, that I came to the city, I met Mr. Eldredge and Colonel Jenkins, and finally before I left I gave Mr. Eldredge other paper, for the purpose of saving the estate to Colonel Jenkins. It was agreed, that this paper should be used as collateral security, for Eldredge to raise the money upon. It was sent back in a few weeks to me. After all other plans for raising the money had fallen through, Mr. Eldredge said, that if the title was in him, he could raise the money to complete the work, but he said all along, that he had no means, in himself, of raising the money in order to get the title. During these negotiations there were frequent meetings between Eldredge, Jenkins and myself, at the office of Hilliard and Jenkins in State street, to talk over the general objects of this business. The agreement there made was, that Mr. Eldredge should take the deed from Deblois, and raise the money to complete the building. Joseph Jenkins, Jr. was generally present at these meetings, and Hilliard sometimes." Again he says: "There was an unqualified bargain for Mr. Eldredge to take the estate without paying any consideration whatever, except for the land, and for the purpose of its being completed for the benefit of Col. Jenkins—of the details by which that agreement was arrived at, I cannot state, as I was not present at all the interviews. I never was present at any interview, when it was arranged, if it ever was arranged, in what manner the estate should be reconveyed to Col. Jenkins." And again: "In the early part of this matter, Mr. Eldredge said, that he would take this property into his hands as desired, and enable the colonel to complete the building, but that he would not be legally bound in the matter, and that they must trust to his life and honor. I never heard any thing said between the parties in the early part of this transaction about the property being sold." There is much more in the testimony of the same witness to the same effect, and it is corroborated in its main bearing by the letter of Eldredge, addressed to him under the date of August 5, 1840, explained by the accompanying circumstances stated in his testimony. Mr. Phillips's testimony, as far as it goes, supports the same conclusion, and shows his understanding, that in taking the deed from Deblois, he was acting as Jenkins's friend, and with a view to benefit his family and creditors, and that the most he expected from his agency was "to take a good shave out of it," (the estate). Mr. Bliss also states: "I have had several conversations, at different times, with Mr. Eldredge, since the conveyance of the estate to him, in which he always refused to give me any legal security on the estate, and also refused to accept Col. Jenkins's order for the amount which he owed me. I always understood from him that he held the estate in trust, not legally, but honorably. I don't know that he used the word 'trust,' but he always gave me to understand, that all he expected was, that he should be paid for his expenditures upon the estate, and also to receive compensation for his services. At first he told me, that he should charge

$5000 for his services, and that afterwards in a proposed settlement with Col. Jenkins, he had agreed to take 3500 dollars. He once offered to convey the estate to me, if I would pay his claim, and get the consent of Col. Jenkins. These conversations took place, I think, on the first half of the year 1841. My impression is very strong, that the offer to convey to me, subject to Jenkins's consent, was made soon after the building was occupied. I cannot undertake to be very confident about the time, but I am very positive as to the fact." The letter of Eldredge to J. W. Jenkins, of May 1, 1841, I cannot but view as showing, that Eldredge, upon the proposal of a reference between himself and the plaintiff of this property, did not treat it as his own sole concern; but that he held it, in fact, upon some honorary understanding, that he was to receive a large compensation for his agency therein. He there says: "The fact is, my friend, that I am resolved to play this game out frankly, fairly and honestly, yielding no right and doing no wrong, and am prepared to make a proper and formal reference when the terms and men are agreed upon, but I shall not swerve an inch from the position that I have taken, viz. that I shall be paid $5000 beside all expenses, or if they do not like that, I will refer the whole matter, and in case I do refer it, shall expect you to appear before the referees as a witness. There is one thing certain, that if that property should ever become fairly mine, the family will be better off than they would be were it in the colonel's hands."

There is, too, a letter, written by the plaintiff to Eldredge, under date of December 16, 1840, which is important, at least to show what was the plaintiff's understanding of his rights in the property, and, if what Jenkins, Jr. states of the occasion of writing it be true, it furnishes very cogent, if not irresistible evidence, that the whole transaction was a mere agency of Eldredge for plaintiff. He says (and it is in answer to a cross interrogatory of Eldredge): "Sometime in May or June, 1839, my father agreed to purchase of Mr. Francis a gore of land at the easterly end of the Deblois land between Bromfield street and Montgomery Place, the consideration for which was to be $200. Shortly after, Mr. Francis called at my office, and told me, that the deed was ready. I knew nothing of the situation of the matter, till after my father had discontinued the work on the building, and had erected on this gore of land the easterly wall to the height of about thirty feet. I understood, when Eldredge took the deed, that this consideration money had not been paid to Mr. Francis, and that he declined giving the deed upon the terms agreed upon, but required that he should have $250, and that the chimneys of his dwelling-house should be carried up to the height of the walls to be erected by my father. I understood also, afterwards, that Francis had raised his demand to $1000. Eldredge then came to me and told me these facts, and that he wished to secure the deed of that gore of land, and that he intended to pay this $1000, but that he wished my father would write him a letter protesting strongly against such a bargain, in order, that the whole responsibility should be thrown upon Eldredge, so that when the estate should be conveyed to my father, he might recover from Francis the difference between $1000 and the original consideration. My father wrote such a letter, a copy of which I annex to this deposition (letter marked A). The letter was delivered by me to Eldredge in person." What says the letter? "Now, sir, you are aware that the ultimate interest in this matter and in the building, which I am erecting on the Deblois estate, is mine. The property is mine virtually, subject only to the payment of such amount as you shall have paid and incurred on that account when you shall convey the property to me: Therefore I do hereby protest against your compliance with the last proposition of said Francis, viz., to pay him $1000—or indeed any sum above the $250—which you originally stipulated to pay him. I shall hold Mr. Francis to the bargain which he made with me last year, notwithstanding any transactions you may have with him—unless perhaps I might submit to the proposition to which you assented and upon which we have acted in the erection of said building. You will understand that whatever you pay the said Francis for said gore of land above the $250, which you have agreed to pay, you must do at your own risk and not with any right to charge the same to me in the adjustment of the affairs of said building." No written reply ever appears to have been made to this letter; and Eldredge in his answer dryly admits, that the protest was made, but that he told the plaintiff, that it was a matter, which concerned himself only, and that he should pay Francis the $1000.

Another not unimportant circumstance, which, I agree, might, standing alone, admit of being deemed a mere offer to reconvey, as owner, independent of any agency, requires to be noticed, because it stands well with the supposition of an agency, although not decisive of it. It is the negotiation and rendering of an account of expenditures on the building by Eldredge to the plaintiff, of which J. W. Jenkins gives the following account. "I was present at an interview between Colonel Jenkins and Eldredge at the Merchants' Bank, sometime in the summer of 1841, which was the interview, which was brought about by me. Mr. Eldredge exhibited in figures and memorandums the amount of the expenditures on the building, and the colonel's indebtment to him. Colonel Jenkins objected to the amount, as Mr. Eldredge had included in it a charge of $5000 for his services, which was not stated as

commissions, and had also included in it a further charge of some 3500 or 3600 dollars, for brokerage. They talked a long time about these charges, Colonel Jenkins offering one thousand dollars, and Eldredge claiming five thousand dollars; and finally it was agreed, that Mr. Eldredge should be paid 3500 dollars. This was the time before spoken of, when it was agreed, that a mortgage on the premises should be given for this charge and other indebtedness of Jenkins to Eldredge. The charge of brokerage was assented to by Mr. Jenkins, if Mr. Eldredge said that he had paid it. After the interview spoken of in the last answer, and after Colonel Jenkins had obtained an injunction against Mr. Eldredge to prevent him from selling the estate, I had an interview with Mr. Eldredge and Joseph Jenkins, Jr. at the Museum Building, at which Mr. Eldredge agreed, that he would do all he could to aid the colonel in getting money to redeem the estate out of his hands, by representing it to capitalists as good security. Mr. Eldredge has, since that interview, told me, that he never believed, that Colonel Jenkins would be able to raise the money. Eldredge, afterwards, I think, got the injunction taken off, and afterwards advertised the estate, as I believe, and told me at that time, that if Colonel Jenkins made another attempt to stop the sale, he would put the deed in his pocket and keep it there, and also, that if he had been allowed to sell it, he should have made over the surplus proceeds for the benefit of Colonel Jenkins's family, and that it would have been better for them to have had it sold."

There is yet another circumstance, that demonstrates, that the plaintiff still retained an interest in the premises, notwithstanding the conveyance to Eldredge; and that is, his procuring securities from J. W. Jenkins, his relative, to aid in the operations of Eldredge. This is not denied; and yet it seems to me wholly irreconcilable with the notion, that, immediately upon that conveyance, the plaintiff was cut adrift from all interest and connexion with the property. These securities were ultimately returned; but what use was made of them in the intermediate time is not satisfactorily explained, nor perhaps is it very material; for it is manifest, that they were received by Eldredge to aid his operations, and were procured by the solicitations of the plaintiff.

These are some of the main circumstances relied on in the evidence to establish the case made by the bill, and denied by the answer of Eldredge. The question is, whether they do not overcome the denials of the answer? The evidence has been assailed with great ability, and sifted with minute and scrupulous diligence, to shake its credibility, and to impugn the conclusions to be drawn from it. There is very little direct evidence in support of the answer. as indeed, from the nature of the case, little could be expected. The release of the plaintiff, I have already adverted to. It is not only not inconsistent with the trusts set up by the bill, but it was manifestly indispensable to be made, in order to induce capitalists to advance the funds necessary to complete the building. The conversation stated by Moses Kimball, has been also adverted to; and it is, as I have already suggested, a confession coming from the plaintiff by an inexorable necessity. The bill in equity, filed by the plaintiff against Eldredge in the state court, in September, 1841, and the answer thereto, and the stipulations agreed between the parties upon that occasion, do not seem to me, so far as the present question is concerned, to affect the posture of the case. They do not materially shift the ground of the present bill. Nor do the circumstances of the reference between Eldredge and David Kimball, or the statements of Mr. Fiske, throw any new and important lights on the matter.

I do not go over the particulars, in respect to the credibility of the testimony, which has been so powerfully pressed, and the improbabilities of the asserted trust, so ingeniously insisted on. I can only say, that, after weighing the whole matter, my judgment is, that the trust, such as it is, is sufficiently established by the evidence to overcome the denials of the answer. But here we are met by an objection—that much of the evidence stands upon confessions and statements, made by Eldredge, and testified to by the witnesses, which are not charged in the bill, so as to let them in as proper evidence. And in support of this objection, among other cases, Hughes v. Garner, 2 Younge & C. Exch. 328; Graham v. Oliver, 3 Beav. 124; Earle v. Pickin, 1 Russ. & M. 547; and especially Attwood v. Small, 6 Clarke & F. 360,—are cited. I had occasion in the case of Smith v. Burnham [Case No. 13,018] fully to consider this whole matter; and I remain of the opinion then expressed, that there is no difference, and ought to be no difference, in cases of this sort, between the rules of a court of law, and those of a court of equity, as to the admission of such evidence. Its admissibility may, however, be properly subject, under particular circumstances, to this qualification, (which Lord Cottenham is said to have supported). that if one party should keep back evidence, which the other might explain, and thereby take him by surprise, the court will give no effect to such evidence, without first giving the party, to be affected by it, an opportunity of controverting it. This course may be a fit one in cases, where, otherwise, gross injustice may be done. But I consider it as a matter resting in the sound discretion of the court, and not strictly a rule of evidence. But whatever may be the rule of evidence in England on this point, it is not so in America; and our practice in equity causes, where the evidence is generally open to both parties, rarely can justify, if, indeed, it ever

should require, the introduction of such a rule. Mr. Vice Chancellor Wigram, in Malcolm v. Scott, 3 Hare, 39, 63, seems to me to have viewed the rule very much under the same aspect as I do. See, also, Story, Eq. Pl. (3d Ed., 1844) § 265a, and note. But, at all events, the practice is entirely settled in this court, and I, for one, feel not the slightest inclination to depart from it, be the rule in England as it may be.

The result, therefore, at which my mind has arrived, is this: Before the time had expired under the agreement with Deblois, the plaintiff entered into an agreement with Eldredge, which was so far completed and fixed, as that each party acted upon it as if definitively settled, that he should become and act as the agent of the plaintiff in the premises; that Deblois should convey the legal title to Eldredge, and that in his favor Jenkins should surrender his equitable title to the same against Deblois, and should consent to her conveyance to Eldredge. That at this time it was known to all the parties, that the plaintiff had expended a large sum upon the premises, amounting to about $15,000. That the object of the arrangement with Eldredge was to clothe him with the whole legal and equitable title in the premises, in order to enable him to raise funds to complete the building, to discharge the debts due to the creditors thereon, and to secure to himself an ample compensation, as agent, for his services and risks in the undertaking. That after he was remunerated for these expenses and charges, Eldredge was to reconvey the premises to the plaintiff, and that, as between them, the same were to be deemed held upon a parol trust, obligatory and conclusive between the parties. That, upon the faith of this arrangement, the conveyance was made by Deblois to Eldredge, and the release or order by the plaintiff, to Eldredge. That the whole of the subsequent acts of the plaintiff in superintending the building, and in attending to the concerns thereof, were done by him, as the ultimate beneficial owner thereof, and that Eldredge was but a compensated agent, and not the true owner. That the subsequent disputes and controversies between the plaintiff and Eldredge have not changed or extinguished the original state of things under this arrangement. That, whatever anomalies appear in the acts and observations of the parties, at different times, were the result of this ambiguous character of the arrangement, looking one way, so far as documents spoke, and designed by the parties to have, as between themselves, a very different operation; and that the subsequent struggles were just such as might be presumed to arise from the diminished confidence and credit which each of the parties placed in the integrity and good faith of the other.

Such, it appears to me, is the true character of the present case, as it may be gathered from the whole evidence in the case. It is, under this aspect, a case of trust, resulting from agency, resting in parol, and intended between the parties to depend upon honorary obligations; but still to be strictly fulfilled. In this view of the case, is it a trust, which a court of equity will enforce, or is it one, which merely rests in the good will and pleasure of Eldredge to perform or not, and is, otherwise, incapable of being executed? It strikes me, that it is a trust of a somewhat novel and extraordinary character, and not exactly arranging itself under any description of trusts, which are usually discussed in the elementary works, or judicial authorities. It possesses mixed ingredients, and has peculiarities, which never before have fallen under my observation. The main ground of objection against it is, that it falls within the category of the statute of frauds. It is essentially a trust, by a parol agreement, respecting an interest in lands.

It is contended on the part of the plaintiff that the case is taken out of the statute, (1) because it is a case of a resulting trust; (2) because it is a case of agency, and fully established; (3) because Eldredge has been guilty of fraud in his conduct and operations; (4) because it is a case for specific performance, the plaintiff having partly performed his part of the agreement, and not being now in a condition to be reinstated in all his former rights. Of course, all these grounds are contested on the other side. My own opinion is, that the case is not to be considered as one standing purely or singly upon either of these grounds, but as embracing ingredients of all of them. Let us look at the case under these several aspects.

In the first place, as to the resulting trust. I agree to the argument, that a resulting trust can only properly arise, by the consent of the parties. But the question here is, whether the circumstances do not demonstrate such a case of consent. The main objection relied on against it seems to be, that the agreement was to vest the whole legal and equitable title in Eldredge. Certainly it was so; but that was not the whole agreement. The agreement was, that it should vest in Eldredge sub modo, so that he might execute all the objects, and raise funds to complete the building. To do this, and to enable him to give a perfect title to capitalists for their advances, he was to have the whole legal and equitable title in himself; and as against such persons making advances, it is clear, that the plaintiff had no rights whatsoever. But as between himself and Eldredge, the conveyance was a mere security for the advances and expenditures of Eldredge, and a compensation for his services; and then the residue, after the discharge of these claims, was for the plaintiff. At the time, when the agreement with Eldredge was made, the plaintiff had a clear equity in the premises

against Deblois. He suffered it to expire under the decree, relying upon the agreement of Eldredge, and the willingness of Deblois,—considering the advances he had made, and services he had performed on the estate,—not to take any advantage of it; a confidence which was, in respect to Deblois, well founded and established in the event. All the parties treated it, at that time, as a case, where the plaintiff was the real beneficiary, and entitled, if not to an equitable title, strictly so called, yet as entitled to a sort of prescriptive right. Now I am not called upon to say, that at the time when Deblois, in consequence of the arrangements with Eldredge, conveyed the premises to him, the plaintiff had entirely lost his equity in the premises, as against Deblois. I entertain great doubts, whether, looking to all the circumstances, it was so. But what I do say is, that, at that very time, the plaintiff had expended a large sum of money on the premises; that Deblois never could have conveyed the same to Eldredge, without the plaintiff's express solicitation and consent; and that Eldredge was in no just sense a purchaser for his own sole account, giving a full value for the premises, but bought with a full knowledge of the enhanced value by the expenditures of the plaintiff, and for the purpose of giving the benefit of such expenditures as a resulting trust between the plaintiff and himself in the premises. In this respect, it approaches very nearly to the case of a joint purchase, where each purchaser is to have an interest in the purchase, in proportion to his advances. Now in such cases, parol evidence is clearly admissible to establish the trust, as well as to rebut, control, or vary it. It appears to me, that it may well be treated as a mixed case; quoad the plaintiff, as a resulting trust pro tanto,—and quoad Eldredge, as a trust pro tanto for his liabilities, expenditures, and compensation. In the view which I take of the matter, it was a resulting trust ab initio, in the intention of both parties, from the moment of the agreement and conveyance, and not a subsequent understanding. But here we are met with the objection, that no parol trust can be set up in opposition to the written documents; and that the conveyance of Deblois and the release of the plaintiff are inconsistent with any such trust. The answer has been already, in fact, given to this objection, by showing, that the trust is not inconsistent with the documents, or purposes for which they were given; but is in harmony with the res gestae. But the court is pressed with authorities on this point, which certainly are of a cogent nature. One of them is Bartlett v. Pickersgill, 1 Eden. 515, 1 Cox, 15, 4 East, 577, note. But that is distinguishable as to the present point, although bearing on the point of agency, for all the consideration did not move from Eldredge for this purchase, in my view of the

evidence, as it did in that case from the agent. The case of Leman v. Whitley, 4 Russ. 423, is far more difficult to answer. There the parol evidence to raise a trust was rejected, that evidence being offered to show, that a son conveyed to his father nominally as a purchaser for £400, but really as a trustee, in order that the father, who was in better credit than the son, might raise money upon it by way of mortgage for the benefit of the son; and the master of the rolls (Sir John Leach) held, that the case was within the statute of frauds, and that it must upon the documents be treated as a purchase. That case is not quatuor pedibus with the present. But still it has a very strong, not to say stern bearing on it. I confess, that I have never felt satisfied with that decision, and should have great difficulty in following it, even if there were no authorities, which seemed fairly to present grounds for doubt. See 2 Story, Eq. Jur. § 1199, note. Lees v. Nuttall, 1 Russ. & M. 53, which will presently be cited for another purpose, looks the other way. Carter v. Palmer, 11 Bligh, N. R. 397, 418, 419, in the house of lords, although distinguishable in its circumstances, does certainly establish a principle, letting in parol evidence to establish a trust in a case of agency. But a very strong case is Morris v. Nixon, 1 How. [42 U. S.] 118, where a trust was actually enforced upon parol evidence by the supreme court of the United States, in contradiction to the answer of the defendant, and to the conveyance and documents passed between the parties; and in many particulars, it approaches very near to the present, for it grew out of an agency as to the premises. Cripps v. Jee, 4 Brown, Ch. 472, is equally strong to the same purpose. There was, indeed, slight written evidence leading to the conclusion, that there was a trust in that case, contrary to the written evidence (as there is in the present case); but the main evidence to show, that the conveyance, although absolute in form, was, in fact, a conveyance in trust to discharge incumbrances, with a resulting trust of the surplus for the grantor, was parol evidence; and upon the parol evidence the court established the trust. Indeed, the transaction in that case is in many respects the counterpart of the present.

In the next place, as to the agency. It appears to me, that here a confidential relation of principal and agent did exist; and that being once shown, it disables the party from insisting upon the objection, that the trust is void, as being by parol. The very confidential relation of principal and agent has been treated, as for this purpose, a case sui generis. It is deemed a fraud for an agent to avail himself of his confidential relation to drive a bargain, or create an interest adverse to that of his principal in the transaction; and that fraud creates a trust, even where the agency itself may be, nay,

must be proved only by parol. Bartlett v. Pickersgill, 1 Eden, 515, 1 Cox, 15, 4 East, 577, note, and Leman v. Whitley, 4 Russ 423, are, I admit, against this doctrine,—not wholly, but to a limited extent; for the latter case excludes a case of fraud. But then Lees v. Nuttall, 1 Russ. & M. 53, expressly decides, that if an agent employed to purchase an estate, purchase for himself and on his own account, he becomes a trustee for the principal. In that case the whole agency and trust was made out by parol, and the purchase was from a third person. Carter v. Palmer, 11 Bligh, N. R. 397, 418, 419, goes the full length of the same proposition.

In the next place, as to the asserted fraud. If, as the argument of the plaintiff supposes, Eldredge originally engaged in the undertaking with a meditated design to mislead the confidence of the plaintiff, and, by practising upon his credulity, and want of caution, to get the title to the property into his own hands, and then to convert it into the means of oppressively using it for his own advantage and interest, I should have no doubt, that the case would be out of the reach of the statute of frauds; for the rule in equity always has been, that the statute is not to be allowed as a protection of fraud, or as the means of seducing the unwary into false confidence, whereby their intentions are thwarted, or their interests are betrayed. There are many authorities in the books turning directly upon this point. See cases cited in 1 Story, Eq. Jur. §§ 252, 256, 768, 1265. In Montacute v. Maxwell 1 P. Wms. 618, 620, which was a bill for the execution of a parol agreement for a settlement upon the wife, of her property for her separate use, the statute of frauds being set up by a plea, that it was an agreement in consideration of marriage, which the statute expressly required to be in writing, and signed by the party, the lord chancellor (Parker) said: "In cases of fraud, equity would relieve even against the words of the statute; but where there is no fraud, only relying upon the honor, word, or promise of the defendant, the statute making those promises void, equity will not interfere." The case is reported in several other books. Finch, Prec. 526; 1 Eq. Cas. Abr. 19, pl. 4; 1 Strange, 236. By the report in 1 Strange, 236, it appears, that although the plea was, at first, allowed, yet upon the plaintiff's amending her bill, alleging some other circumstances resting mainly in parol, the plea was ordered to stand for an answer. The case itself seems originally to have stood upon a peculiar ground, that marriage is not a part performance to take the case out of the statute, contrary to the common rule in other cases within the statute; and has been so understood by subsequent judges. See Dundas v. Dutens, 1 Ves. Jr. 196, 199, 2 Cox, 235; Redding v. Wilkes. 3 Brown, Ch. 400, 401; Taylor v. Beech. 1 Ves. Sr. 297, 298. In its general language,

the case affirms the doctrine, that fraud takes the case out of the statute, even in cases of agreements in consideration of marriage. The other language, that it is otherwise where there is no fraud, but reliance is solely placed upon the honor, word, or promise of the party, must be limited to cases of marriage; and certainly is inapplicable to cases, where there has been a part performance or execution of the agreement on the other side. Indeed, the whole doctrine, even in relation to agreements on marriage, does not stand upon any clear and satisfactory ground; for if a man promises, upon his marriage, to make a settlement upon his intended wife, and she is, by a fatal confidence in his good faith and integrity, induced to celebrate the marriage before the settlement is executed, and he designedly misleads her, not intending at the time to perform his agreement—it seems to me as arrant a fraud as could be perpetrated upon an innocent and unsuspecting woman. I doubt the whole foundation of the doctrine, as not distinguishable from other cases, which courts of equity are accustomed to extract from the grasp of the statute of frauds. It is not, however, necessary to consider, what should be the true rule in such a case; the present is not one of that nature; but stands upon very different grounds. I think, moreover, that there is one ingredient in the present case, which gives it a marked character, which is often relied on in cases of agreements on marriage, that Eldredge did agree to reduce the trust to writing, and to keep a private memorandum thereof in his own possession, as evidence, in case of his death or other accident. I do not accede to the statement, that this was a mere subsequent promise, long after the execution of the conveyances, as his answer imports; but it was a part of his original agreement, and upon the faith of which the arrangement was completed. He never did comply with that part of the agreement. He admits, that he never made any such memorandum. If he had made one, it might have swept away the whole of his present defence. I should not incline, however, to impute to Eldredge any such original premeditated intention of fraud as the argument of the plaintiff supposes, unless driven to it by the most cogent circumstances of necessity. And it does not seem to me necessary, in this case, to go to such a length. In my judgment, the result is the same, although the original design of Eldredge was perfectly fair, and honorable, if he has since deviated from his duty, and attempted to absolve himself from the obligations of the trust, such as he knew the plaintiff believed it to be, and constantly acted upon; because, in point of law, it would be a breach of trust, involving a constructive fraud, such as a court of equity ought to relieve. Mr. Chancellor Kent, in his excellent Commentaries (volume 4, 5th Ed., p. 143). has

laid down a doctrine broad enough to cover the present case. He says: "A deed absolute upon the face of it, and though registered as a deed, will be valid and effectual as a mortgage as between the parties, if it was intended by them to be merely a security for a debt. And this would be the case, though the defeasance was by an agreement resting in parol; for parol evidence is admissible to show, that an absolute deed was intended as a mortgage, and that the defeasance had been omitted or destroyed by fraud or mistake." In the case of Taylor v. Luther [Case No. 13,796], I had occasion to carry the doctrine one step farther, and to say, that "it is the same, if it be omitted by design, upon mutual confidence between the parties; for the violation of such an agreement would be a fraud of the most flagrant kind, originating in an open breach of trust, against conscience, and justice." And this is fully supported by the case of Morris v. Nixon, 1 How. [42 U. S.] 118.

In the next place, as to the ground of a part performance on the part of the plaintiff. From what has been already suggested, there seems to me strong ground to support this suggestion. The plaintiff did, at the time of the conveyance to Eldredge, surrender up his present rights, or just expectations, under the contract with Deblois; he suffered his equity to expire, and he agreed to give up to Eldredge all claims, which he might have to the premises; and consented to a direct conveyance thereof to Eldredge. He did more; he surrendered up all remuneration for his past advances and services; and also all remuneration for his future services, except so far, as ultimately, after satisfying all other claims, there might remain a surplus of value of the property to indemnify him. It has been suggested, that he had, at the time, no claim upon Deblois for those advances, or services, or improvement of the property. I doubt, if, in equity, that doctrine is maintainable, if the value in the hands of Deblois had been greatly enhanced thereby. But upon this, to which allusion has been before made, I do not dwell. But I do put it, that none of these acts would have been done; and, above all, the release to Eldredge by the plaintiff would never have been executed, but upon the faith, that the trust was to exist for the plaintiff's benefit, and the release was a part execution of the agreement between him and Eldredge. And here I cannot but remark, that the very exception in the deed of Deblois to Eldredge, (a most fit and proper exception, under the circumstances, and upon which the release was designed to operate) "excepting any claim or demand made by, through, or on account of Joseph Jenkins, and also excepting any claim or demand, arising out of any contract made by or with said Jenkins,"—shows clearly, that all the parties understood, that Jenkins then had or claimed some right or title in the premises, and that the extinguishment of it was essential to the security of purchasers. So that, upon the ground of part performance, there is much in the case to take the case out of the reach of the statute. In concluding my remarks on this head, I wish to add, that my opinion has proceeded upon the ground, that there is no substantial difference between the statute of frauds of Massachusetts, either under the act of 1783, c. 37, § 3, or the Revised Statutes of 1835, c. 59, § 30, and the statute of 29 Car. II. c. 3, on the subject of trusts; and such is the conclusion, to which I have arrived, upon the examination of these statutes.

It remains for me to notice several other objections, which have been pressed upon the attention of the court. In the first place, the lapse of time, and the omission of Jenkins to institute the present suit at an earlier period. Taking all the circumstances of the case, there does not appear to me to be any ground whatsoever for this objection. The whole controversy has been continually kept alive by a constant course of adverse operations or claims. Then, again, it is said, that the plaintiff has never, up to the time of the commencement of the present suit, been able to comply with the terms of the agreement, as he states it, from his total want of means and credit, to discharge the charges and incumbrances thereon. This is probably true. But still it furnishes no ground, upon which a court of equity can say, that his rights are extinguished, although it might furnish a ground, why a court of equity, upon the application of Eldredge, might be called upon to interfere to foreclose his rights, or to order a sale of the property, to discharge the charges and incumbrances thereon; if not done within a reasonable time.

In the next place, the proceedings in the bill in equity of Jenkins v. Eldredge [unreported], filed in the supreme court of the state in September, 1841, is relied on as a bar to the present suit. There was a stipulation in that case, that unless the plaintiff should, within sixty days from the 22nd of November, 1841, fulfil all the conditions stated therein, his bill should be dismissed with costs for the defendant (Eldredge.) The conditions were not complied with, and accordingly, on the 24th of January, 1842, the bill was dismissed. Now it is difficult to perceive how the dismissal of that suit, under all the circumstances, can be held as a strict technical bar to the present. It was not a dismissal after any hearing upon the merits; the stipulation was signed by Jenkins alone, and was not mutual in its operation. It contains no agreement, that the dismissal shall be final, as upon the merits of the matters contained in the bill. There is, also, much reason to suppose from the decision in the case Gould v. Gould, 5 Metc. (Mass.) 274, that the supreme court of the state would, upon a hearing, have held the

case not to be within its jurisdiction, as embracing matters of constructive trust and fraud. But upon this, it is not necessary to express any definitive opinion, since the decree" does not purport to be a decree upon the merits; and unless it were so, or the parties expressly agreed to give it that effect, it would not be a bar. The only possible manner, in which it can be permitted to bear upon the present case, would be as a reason addressed to the discretion of the court, why, after such shifting and protracted litigation, it should not interfere, and prolong the controversy. But there are circumstances in the case, which would prevent the court, as a court of equity, from pressing severely upon the plaintiff. He was a broken down man,—broken in credit, and driven, if one may so say, to desperate expedients, to seize upon any plank in the shipwreck of his hopes. Eldredge, too, it seems, had promised to aid him in his endeavors to perform the stipulation; but so far from keeping his promises on this head, if the evidence is believed, he seriously obstructed him in his efforts to obtain pecuniary aid.

In the next place, as to the pendency of the bill in equity, of Bliss v. Jenkins [unreported], in the state court, before and at the time when the present suit was brought; it appears to me in nowise to amount to a bar, in any just sense. The parties are not the same; the bills have different objects; different equities are involved in them; and the relief prayed for proceeds upon different grounds, and must, or may, involve different decrees. Moor v. Welsh Copper Co., 1 Eq. Cas. Abr. 39. The only case apparently bearing on the point is entirely distinguishable in its character; for the plaintiff in the first suit, after the suit was brought for certain stock, and while it was pending, had sold a part of the shares of the stock in controversy to the plaintiff in the second suit, who brought the latter suit against the same defendant, to enforce his claim to the same shares; and it was to this latter suit that the plea was put in. The plea was held bad, because not well pleaded in its structure, though the court thought it might, if well pleaded, have been sustained as a bar to the second suit. Story, Eq. Pl. §§ 737. 738. I see no reason to be dissatisfied with this decision. It proceeded upon the plain ground, that a plaintiff should not, any more than a defendant, be allowed pendente lite to create a new interest in the suit. which should displace the rights of the defendant. It does not appear that Jenkins has ever appeared to answer in the suit of Bliss, and, indeed, Eldredge, in his answer, says, that he knoweth not, that he has appeared. The injunction granted in that suit, is against Eldredge only; and for aught that appears, Jenkins is not at all bound by that suit; and the mere fact, that Bliss has brought a suit against him, claiming an adverse interest, does not compel Jenkins to abandon a suit brought to enforce his own rights against Eldredge. What may hereafter be fit and proper to be done touching the suit of Bliss, in order to protect his interest, and to save Eldredge from a double responsibility, is a matter which may, in a further stage of the present suit, require the consideration of the court. At present, I do not intermeddle with the inquiry.

There are many other circumstances in the case, upon which the parties have relied, and which might furnish matter for comment, if this opinion had not been protracted to an unusual length. It cannot, however, be necessary to dwell on them; for they do not materially change the complexion of those considerations, which have been already suggested.

In respect to the case of the defendant, Kimball, the whole merits turn upon this, whether he is a bonâ fide purchaser for a valuable consideration, without notice. I am clearly of opinion that he is not such a purchaser, and, therefore, he must share the fate of Eldredge in respect to the bill. If he had not full notice of the actual state of the title, and the claim of the plaintiff to the premises, at the time of his purchase,—which I very much incline to think he had,—he had sufficient notice of the claim and controversy, to be put upon inquiry; and, in a court of equity, no purchaser is at liberty to shut his eyes, and to remain voluntarily in ignorance of facts within his reach, and then claim protection as an innocent purchaser. Even his own answer leaves him with strong presumption, that he was content to purchase with all the infirmities which might attach to the title, and to take his chance of success in common with Eldredge.

These are all the remarks which I deem necessary to make in the case. I have deliberated upon it with much solicitude and care; and the parties have now the result of my best judgment. That judgment, however, is not, I have the consolation to know, final; and the supreme court, upon an appeal, can correct any errors into which I may have fallen. This is the last case which, if I could have had my choice, I should ever have desired to have entertained in this court. It is, at every turn, surrounded with difficulties and obscurities, from which I would have gladly sought deliverance. But courts of justice must act upon cases, as the parties choose to present them, and their duty is not to shrink from uninviting labors, but to survey, and, if practicable, to master the intricacies. "Hic labor extremus, longarum haec meta viarum." I shall, therefore, declare, that the plaintiff is entitled to relief, according to his bill, upon the ground of the defendant, Eldredge, being an agent and trustee of the plaintiff in the premises; and I shall refer it to a master, to ascertain and report to the court. what is due to Eldredge for his advances. disbursements. expenditures, and compensation in the premises. The mas-

ter is to be at liberty to examine both parties upon oath, as to any matters within the scope of the inquiries before him, and to require the production of all vouchers and documents in the possession of either of them, to aid him in the proper inquiries. I shall reserve all other orders in the premises until the coming in of the master's report.